LAMAR AND NORMA K. HUNT, et al., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Hunt v. Commissioner
Docket Nos. 10140-88, 10141-88, 10142-88
United States Tax Court
T.C. Memo 1990-248; 1990 Tax Ct. Memo LEXIS 267; 59 T.C.M. (CCH) 635; T.C.M. (RIA) 90248; May 22, 1990, Filed *267 Decisions will be entered under Rule 155. Ralph A. Muoio, Julie W. Davis, Daniel B. Rosenbaum, and Albert G. Lauber, Jr., for petitioners in docket No. 10140-88. Thomas P. Marinis, Jr., Michael J. Henke, Michael E. Glover, Roger Evans, James S. Meyer, Judith B. Baumgartner, and Sarah A. Duckers, for petitioners in docket Nos. 10141-88 and 10142-88. Deborah Butler, Rebecca Wolfe, Allan Lang, and Emron Pratt, for the respondent. KORNER, Judge. KORNER
*883 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined income tax deficiencies in 1982 Federal income tax for Nelson Bunker ("N. B.") and Caroline L. Hunt, William Herbert ("W. H.") and Nancy B. Hunt, and Lamar and Norma K. Hunt in the respective amounts of $ 154,919,798.50, $ 158,496,452.17, and $ 550,377.55. Respondent's determination is primarily based on his theory that the three Hunt brothers had cancellation of indebtedness income in 1982. Respondent's primary reason for this determination is that a partnership involving the three Hunt brothers did not constitute a valid partnership for Federal income tax purposes. Respondent alternatively argues that even if the partnership is a valid partnership for Federal income *268 tax purposes, (i) its dissolution in 1982 resulted in constructive distributions of loan guarantee rights to N. B., W. H., and Lamar, and, (ii) that N. B., W. H., and Lamar realized cancellation of indebtedness income attributable to their release from periodic contribution obligations, as well as from the discharge of a $ 272 million note. In addition, we must decide whether N. B., W. H., and Lamar were considered "at risk" to the extent of their partnership losses. We must also decide whether Lamar is entitled to an increase in basis in his stock in the Tampa Bay Soccer Club and whether Lamar and Norma Hunt overstated their real estate expenses in the amount of $ 12,579.64. Finally, we must address the propriety of our decisions: (i) excluding certain expert testimony and reports; (ii) denying respondent's motion to compel production of documents; and (iii) granting certain third-party motions to quash respondent's subpoenas. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits are incorporated by this reference. N. B. and Caroline L. Hunt, husband and wife, W. H. and Nancy B. Hunt, husband and wife, and Lamar and Norma *269 K. Hunt, husband and wife, all collectively referred to as petitioners, resided in Dallas, Texas, at the time their petitions were filed. Each of the three couples were accrual basis, calendar year taxpayers in 1982. N. B., W. H., and Lamar Hunt are children from the first marriage of the late Texas oil man, H. L. Hunt, Sr. N. B. and W. H. followed their father into the oil and gas business and other energy-related activities. Lamar has invested in some oil and gas properties over the years, although his principal business interests have been in the area of sports and entertainment. In 1982, Lamar owned the Kansas City Chiefs football team, was president of the American Football Conference, and was actively involved in National Football League affairs. Placid Oil Company - Background
Placid Oil Company ("Placid") was incorporated under the laws of the State of Delaware on December 16, 1936. During 1980 through 1982 the stock of Placid was owned by the six trust estates created by H. L. Hunt and his spouse, Lyda Hunt: the Margaret Hunt Trust Estate, the Haroldson L. Hunt, Jr., Trust Estate, the Caroline Hunt Trust Estate, the N. B. Hunt Trust Estate, the W. H. Hunt Trust Estate, *270 and the Lamar Hunt Trust Estate. Each trust estate is managed by a self-perpetuating advisory board that consists of a trustee and two advisory board members. The trustee cannot engage the trust in major business transactions without the consent of at least one other advisory board member. Under the declarations of trust, the rights of the income beneficiaries of the trust estates are limited to the right to receive distributions of net earnings of the trust estates and the right to name income beneficiaries upon their respective deaths. From its inception, Placid engaged primarily in oil and gas exploration and production. In connection with this business, Placid was accustomed to making high risk investments that had the potential for high returns. During the 1970's, Placid began to diversify and seek alternative lines of business, including exploration for gold, silver, coal, and other hard rock minerals throughout the world. Placid's interest in silver was evidenced by its investment in silver futures contracts in the spring of 1980, and by its attempt in February of 1980 to acquire control of the Gulf Resources & Chemical Corporation, a publicly traded natural resource company *271 that reported ownership of significant silver, gold, and coal assets. During the 1970's, Placid also reviewed a variety of coal prospects and nonconventional energy projects involving coal, oil shale, and heavy oil and was optimistic about the prospects for profitable development of coal properties for synthetic fuels. During the 1970's, Placid looked for coal in a number of states and eventually reviewed between 75 and 100 coal prospects. Placid purchased the lignite mineral rights to certain properties in Louisiana, Arkansas, and Texas. Silver Investment by the Hunt Brothers
From 1973 through the spring of 1980, N. B. and W. H. Hunt invested heavily in silver bullion (including silver coins), silver futures contracts, and silver forward contracts. In 1974, Lamar began to invest in silver, but to a much lesser extent than his brothers. Lamar only invested in silver futures contracts which he would either roll forward or sell when they came due. He never took delivery of physical silver. *884 These investments were made by the Hunt brothers individually, not on behalf of Placid. During the late 1970's, the price of silver rose sharply. During September 1979, the spot price of silver *272 rose from less than $ 11 per ounce to a high of $ 16.85 per ounce. In December 1979, the price rose even more sharply, from under $ 20 per ounce to $ 28 per ounce. By January 21, 1980, the price of silver had reached $ 48 per ounce. The Hunts' Liquidity Crisis
In late January 1980, the Commodity Exchange, Inc. ("COMEX"), and the Chicago Board of Trade ("CBT") ruled that silver futures trading was to be for "position liquidation" only. [2] Essentially, this policy prohibited speculative traders and investors from establishing new long positions and forced them to sell contracts in excess of position limits. The CBT and COMEX also significantly increased the margin requirements for speculative silver positions. Following the imposition of the new CBT and COMEX rules, the price of silver began a rapid decline. On January 31, 1980, the spot price was $ 34 per ounce. By March 27, 1980 ("Silver Thursday"), the spot price had declined to $ 11.10 per ounce. As a result of the rapid *273 decline in the price of silver starting in late January 1980, N. B., W. H., and Lamar Hunt were required to make substantial variation margin payments with respect to their silver contracts. They were also required to make additional deposits of collateral with respect to other silver-related obligations. N. B. and W. H. Hunt unsuccessfully attempted to obtain loans from U.S. and European banks to help them meet these silver-related obligations. In early March 1980, Placid loaned N. B. and W. H. $ 105 million and Lamar $ 5.5 million to meet their margin calls. However, this infusion of funds proved insufficient. By the end of the day on Wednesday, March 26, 1980, N. B., W. H., and Lamar Hunt were unable to meet their cash obligations with respect to silver, later estimated to exceed $ 800 million. The Engelhard Transaction
In January 1980, shortly before silver prices plummeted, N. B. and W. H. Hunt agreed with Philipp Brothers, a division of Engelhard Minerals and Chemicals Corporation ("Engelhard"), to exchange silver futures contracts for physical silver. On March 28, 1980, W. H. Hunt informed Engelhard that he and N. B. Hunt would not be able to consummate the $ 434 million *274 purchase of silver due to occur on March 31, 1980. During subsequent discussions over the next several days, Engelhard threatened to force N. B. and W. H. Hunt into bankruptcy and/or to take legal action to "pierce" the N. B. Hunt Trust Estate and the W. H. Hunt Trust Estate in order to use the assets of Placid to satisfy its claims. N. B. and W. H. Hunt attempted to borrow additional funds to satisfy the Engelhard obligation. On March 30, 1980, they met with representatives of several major U.S. banks in Boca Raton, Florida, and requested a loan for use in settling their obligation to Engelhard, as well as their other obligations to various banks and brokerage houses. The bankers refused to make a loan. On March 31, 1980, N. B. and W. H. Hunt reached a settlement with Engelhard that required them to assign to Engelhard their interests in certain silver bullion as well as a 20-percent interest in certain oil and gas leases in the Beaufort Sea area. The Beaufort Sea leases were owned by the three Hunt brothers, in part, through a partnership, Hunt International Petroleum Company of Canada. Engelhard also kept the silver N. B. and W. H. Hunt had contracted to purchase. Placid's *275 Concern About the Hunts' Financial Crisis
Notwithstanding the Engelhard settlement, the three Hunt brothers still faced financial difficulties and the possibility of personal bankruptcy as a result of the silver crisis. They were not able to find a bank willing to directly loan any of the funds to facilitate financing of their silver-related obligations. Placid's management and board of directors and that of its principal bank, First National Bank of Dallas ("FNBD"), were concerned that Placid's operations and business would be materially impaired and adversely impacted if any of the Hunts declared bankruptcy. Although Placid was a corporation independent of the Hunts, there nonetheless existed a public perception that Placid was owned and/or controlled by the three Hunt brothers. Due to this perception, the management and boards of directors of Placid and FNBD believed that a Hunt bankruptcy would damage Placid's superior reputation and standing in the business and financial communities, as well as impair its ability to obtain credit for oil and gas operations. Placid further believed that such a bankruptcy would materially and adversely affect its ability to bid on Federal offshore *276 leases, its future applications for foreign licenses and concessions, as well as its ongoing business relations in joint ventures, partnerships, and with trade creditors. Placid management also believed, and had been advised, that Placid might face litigation with *885 creditors of the three Hunt brothers who might attempt, as Engelhard had threatened, to pierce the trust estates and invade the assets of Placid to satisfy their claims against the Hunts. The Back-to-Back Loan Proposal
Early in the week of March 31 to April 4, 1980, Walter Fraker, Vice President and Treasurer of Placid, met with various members of the Hunt family and acknowledged that Placid had the capacity to borrow $ 800 million. Later that same week, Elvis Mason, Chairman of the Board of Directors of FNBD, met several times with the three Hunt brothers and Placid representatives to discuss the crisis. On April 4, 1980, Mason met with the Hunt brothers' sister, Margaret Hunt Hill, an officer and director of Placid. Mrs. Hill also discussed the situation and its effect on Placid with the Placid management and other members of the Placid board and with her sister, Caroline Rose Hunt. To avoid any conflict of interest, *277 Caroline Rose Hunt replaced Lamar Hunt on the Placid board, and Lamar Hunt resigned as an officer of Placid effective April 5, 1980. Due to the potential impact of the Hunts' financial crisis on Placid, the parties initially considered a proposal that called for a credit line (initially $ 800 million) from FNBD, Morgan Guaranty Trust Company of New York ("Morgan"), and various participating banks to Placid, with a subsequent loan from Placid to the three Hunt brothers. This proposed line of credit and the subsequent negotiations which led to the ultimate transaction were discussed with officials of the Federal Reserve Board and the Comptroller of the Currency, due to the potential application of the Federal Reserve Board's Voluntary Credit Restraint Program (then in effect) that restricted the lending of funds by U.S. banks for speculative purposes. On April 5, 1980, the Placid board of directors met and approved Placid's participation in a loan agreement between Placid and the three Hunts, providing for advances to the Hunt brothers of up to $ 800 million (the "Master Note"), conditioned upon final approval of the banks' credit facility to Placid. Placid's March Loans to N. B., *278 W. H., and Lamar Hunt were renewed and consolidated under the Master Note. $ 300 Million Interim Loan
On April 8, 1980, while various courses of action were being discussed, the Banks made an interim loan of $ 300 million to Placid. With the proceeds of this loan, Placid then purchased notes of each of the three Hunt brothers payable to the First National Bank of Chicago aggregating $ 100 million, plus interest of $ 1,454,026 (the "Chicago Notes"). Lamar's share of this amount was $ 50 million. Placid purchased (rather than repaid) the Chicago Notes in order to facilitate the Hunts' transfer of title in their Beaufort Sea leases in accordance with the terms of the Engelhard settlement, since the First National Bank of Chicago had a lien on the Beaufort Sea interests securing the Chicago Notes. The Chicago Notes were listed as a separate debt receivable from the Hunts on Placid's books. During the remainder of April and early May, Placid loaned an additional $ 201 million to the three Hunts pursuant to the Master Note, of which $ 12 million was advanced on behalf of Lamar. The $ 201 million advance was used to pay silver-related creditors by the Hunts. When combined with the *279 earlier $ 110.5 million March Loans, the total amount loaned under the Master Note was approximately $ 312 million. Various Structures Considered
Early in the course of negotiations toward a definitive arrangement, a major problem developed with the back-to-back loan proposal. The bankers were advised by legal counsel that a loan to Placid would be governed by New York law (under which no practical usury limitation existed), and that a loan by Placid to the Hunts would be governed by Texas law (where the interest rate would be subject to the limitations of the Texas usury laws). Since the prime rate of interest at the time the negotiations commenced was approximately 20 percent, the rate of interest that would have been charged to Placid under the credit facility would have been in excess of 21 percent (103 percent of Morgan prime + 1/2 percent). At that time, the Texas usury limit was 18 percent and there was a preemptive Federal usury ceiling of 21 percent. Thus, Placid would have been unable to lawfully charge the Hunts an interest rate equal to or greater than the rate at which it would borrow from the Banks, resulting in a negative spread to Placid. Placid objected to the *280 back-to-back loan because it would not provide a net return to it. Additionally, Placid's fiduciary responsibilities to the trust estates prohibited its directors and management from entering into back-to-back loans under such circumstances, where Placid could not show any profit incentive to warrant entering into the transaction. The banks would also not participate in a transaction that was unprofitable to Placid. The usury and fiduciary concerns of all the parties led to the rejection of the back-to-back loan proposal. An alternative structure considered was a proposal for Placid to purchase the silver assets of N. B. and W. H. Hunt, with the proceeds of the sale to be used by N. B. and W. H. Hunt to discharge their silver-related debts. This proposed asset purchase plan was abandoned as the result of two undesirable consequences. First, time was a critical factor in the transaction, and *886 there were certain securities law requirements that would have taken more time than was possible. Second, a purchase by Placid would have involved serious adverse tax consequences to N. B. and W. H. Hunt, they were advised. Specifically, the purchase price of a portion of the silver would *281 have exceeded their tax basis and accordingly resulted in taxable gain to N. B. and W. H. In addition, because of section 267 [3] of the Internal Revenue Code, any losses from the transaction would not have been recognized by the Hunts for tax purposes. Thus, all gains would have been required to be recognized without any offset for losses. The Partnership Solution
Placid, the Hunts, and the banks finally agreed that the most appropriate and desirable structure, in light of the various business and regulatory considerations, was a limited partnership. N. B. Hunt and W. H. Hunt, as limited partners, would contribute their silver-related assets and indebtedness and certain other assets, including undeveloped coal properties in North Dakota. Placid, as general partner, would contribute cash. On May 1, 1980, Placid and the three Hunts signed a partnership commitment letter formalizing their intent to enter into such a partnership. At the same time, Placid and the banks signed a bank *282 commitment letter pursuant to which the banks agreed to loan Placid funds to contribute to the partnership. Lamar agreed to be a limited partner because he wanted to help his brothers. Lamar understood that the banks would not make Placid the $ 1.1 billion loan unless he was included in the partnership. Under the limited partnership structure, Placid had a profit potential through its interest in the partnership, and the undesirable tax consequences of a sale of their silver assets by N. B. and W. H. Hunt to Placid were avoided. In addition, Placid (through a wholly-owned subsidiary), as the sole general partner of the limited partnership, had exclusive control over the silver assets, with the Hunts' participation in management restricted. This satisfied certain nonfinancial concerns of the Federal regulatory authorities regarding future control and disposition of the silver. Accordingly, the Federal Reserve Board and the Comptroller of the Currency approved the banks' credit extension to Placid and Placid's contribution of the loan proceeds to the partnership as consistent with their dual concerns that the silver be disposed of in an orderly manner and that the loan to Placid to *283 fund its investment in the partnership not be used to facilitate further speculative activity. The Federal Reserve Board also preferred having the participation of Placid in the limited partnership to force the liquidation of the silver, rather than relying upon the bare promise of the three Hunt brothers. N. B., W. H., and Lamar Hunt were represented in the negotiations by James Parker, vice president and treasurer of Hunt Energy Corporation ("Hunt Energy"), and the law firm of Shank, Irwin, Conant, Williamson & Grevelle ("Shank Irwin"). Placid and its shareholders (the six trust estates) were represented by Placid management and Carl Wilson of the law firm of Gardere, Wynne & Jaffe ("Gardere Wynne"). Each Bank participating in the credit facility was represented by separate counsel. Parker did not perceive that there was any conflict between his representation of the Hunts and his role as trustee of the Nelson Bunker Hunt Trust Estate, since Placid was adequately represented by independent counsel. During the course of these negotiations, the loan to Placid from the banks was increased in size from $ 800 million to $ 1.1 billion, in order to accommodate a purchase by the partnership *284 of silver-related assets from the International Metals Investment Company, Ltd. ("IMIC"), a Bermuda corporation in which N. B. and W. H. Hunt owned an interest. Placid's Business Purpose
The limited partnership alternative appealed to Placid as a business proposition because of its long-standing interest in precious metals and coal, and because it presented Placid with an opportunity to realize a substantial profit from the sale, disposition, and/or development of the assets of the partnership. Moreover, the partnership solution eliminated the threat of potential litigation between Placid and creditors of the three Hunts and avoided the disruption of Placid's business operations that would have been caused by a Hunt brothers' bankruptcy. Despite the potential downside to Placid from an investment in the partnership, Placid management believed that the decision to enter into the partnership was consistent with its fiduciary obligation to its stockholders (the six trust estates). The risk that the partnership would be unsuccessful was consistent with the risks undertaken by Placid in its exploration for oil and gas. At the time of the partnership's formation, Placid's management, directors, *285 and shareholders (the six trust estates) believed that the price of silver would eventually rise above $ 20 per ounce and that Placid would consequently realize large profits from the orderly liquidation of the silver assets, primarily through private *887 sales. The three Hunt brothers had a similar, if not more optimistic, outlook on the future of the silver market. Placid and the Hunt brothers viewed the development of the North Dakota coal properties in a like fashion. Partners' Valuation of Contributed Assets
The investment banking firm of Goldman, Sachs & Co. was retained by Placid to provide an independent opinion as to the value of the silver-related assets to be contributed to the partnership by N. B. and W. H. Hunt. The Goldman Sachs opinion was based upon analyses of market volume, price data, and supply and demand in the silver market. The opinion expressly considered the size of the silver holdings to be contributed to the partnership, as well as the regulatory requirement of an "orderly disposition" of the silver. Daniel Amstutz, the Goldman Sachs partner who was most involved in the valuation of the silver, had broad experience in the silver market and had previously *286 been the president and CEO of a commodities futures trading company. Goldman Sachs advised Placid that it was reasonable to value the silver for contribution purposes within a range from $ 10 to $ 16 per ounce. To safeguard Placid's position in the partnership, the Banks required that the value of the silver not be unrealistically or inappropriately high. After calculating several averages of historical silver prices provided by Goldman Sachs, the parties ultimately agreed to use a value of $ 14.05 per ounce. Although N. B. and W. H. Hunt asserted that the value placed on the silver was too low, the Banks and Placid's management and shareholders believed that $ 14.05 was a fair contribution value. Placid's coal department conducted an internal evaluation of the coal properties to be contributed to the partnership. The coal properties consisted of undeveloped mineral leases with a 20-year term and a 20-year renewal option, covering 12 separate coal field areas in western North Dakota. These properties contained reserves of 1.9 billion tons of lignite coal, equivalent in energy terms to an oil deposit of over 4 billion barrels. Placid geologists William Biskamp and Paul Jackson; A. *287 F. Nickelson, Placid Vice President for Exploration; and Donald Zimmerman, a professional coal geologist employed by Hunt Energy, examined existing files with respect to the properties, verified the estimated reserve tonnage of 1.96 billion tons, and concluded that a contribution value of 15 cents per ton, or $ 294 million, was reasonable. This conclusion was arrived at after contacting a number of industry sources and inquiring as to the current prices for lignite in place. Robert Jensen, a geologist for FNBD with experience in evaluating coal properties, independently verified the estimated reserve tonnage in place and also appraised the coal properties at a value of approximately $ 294 million. Comparable sales of other North Dakota lignite properties, in the vicinity of the reserves contributed to the partnership, reflect a range of values between 18 cents and 28 cents per ton in 1980. Beneficiaries' Consent to the Partnership Transaction
The closing of the loan agreement and the formation of the partnership were both conditioned upon securing the informed consent of the six trust estates that were the shareholders of Placid, as well as the consent of the adult beneficiaries *288 and the adult contingent beneficiaries of those trust estates. After consulting with counsel, the trustees and advisory board members of the trust estates gave their consent to the transaction, ratifying the actions of the Board of Directors, at a special stockholders meeting held on May 21, 1980. The law firm of Carrington, Coleman, Sloman & Blumenthal and B. Patrick Shaw were retained for the beneficiaries to handle the disclosure process necessary for obtaining consents from each individual. Several meetings were held for the beneficiaries, where their lawyers and representatives of Placid and Goldman Sachs explained the structure of the transaction, the valuation of the assets to be contributed to the partnership, and the potential risks and benefits to Placid, and answered questions. The transaction documents were made available to and reviewed with the beneficiaries. The consents obtained under this procedure were informed consents that were voluntarily obtained from all of the beneficiaries. Formation of the Partnership
On May 13, 1980, Placid formed a wholly-owned subsidiary, Placid Investment Company ("PIC"), in preparation for formation of the partnership. None of the *289 Hunts served as officers or directors of PIC. The negotiations, documentation, valuation, and consent processes for the formation of the partnership were completed in mid-May. On May 21, 1980, Placid and PIC each gave their formal approval to enter into the partnership by resolutions of their respective boards of directors. On May 22, 1980, Placid Investments, Ltd. ("PIL"), was formed, effective as of April 28, 1980, pursuant to the Texas Uniform Limited Partnership Act, with PIC as general partner and N. B., W. H., and Lamar Hunt as limited partners. The agreement of limited partnership and documents conveying the assets contributed to the partnership were executed and held in escrow pending closing on the loan from the banks to Placid. Toward the end of the negotiations for the loan, the banks insisted that Lamar be included in the partnership as an additional guarantor of certain contingent obligations to the general partner called "periodic contribution amounts" *888 ("PCA's") under the partnership agreement. The PCA's included repayment of 98 percent of the capital that the general partner had contributed to the partnership, plus an 18-percent return on unrecovered capital. The *290 Banks wanted Lamar's personal assets, as well as those of Bunker and Herbert, to serve as collateral for the PCA obligations. Under the contract of partnership, however, the obligation of the Hunts to make additional capital contributions under the PCA's did not arise until and unless the income of the partnership fell below certain designated levels. Partnership Distribution Provisions
The distribution provisions of the partnership agreement provided the following preferential distributions: first, Placid and the three Hunts would receive a cumulative return on investment of 18 percent; second, Placid would receive a return of its capital contributions; third, the partners would receive secondary cumulative returns of 26 percent (PIC) and 25 percent (Hunts); and fourth, the limited partners would receive a return of their capital contributions. Under the partnership agreement, PIC, the general partner, and the three Hunt brothers, as a group and as limited partners, respectively, were entitled to 50 percent of partnership profits after the above preferential distributions. The limited partners' 50-percent share was to be divided 59 percent to N. B. Hunt, 40 percent to W. H. Hunt, *291 and 1 percent to Lamar Hunt. To the extent that the net cash flow of PIL was not sufficient to pay the primary preferential distributions (18 percent on unrecovered capital) plus a return of 98 percent of the general partner's capital contributions, the limited partners had an obligation to make PCA payments of capital to PIL, to provide it with sufficient cash to make such distributions. The terms of the bank loan and the partnership agreement required that the limited partners make the PCA at such times as the bank loan became due (in the event net cash flow from the partnership was insufficient). Although contingent upon partnership cash flow, the PCA provisions were not dependent upon payments becoming due under the bank loan. If Placid had prepaid a portion of the bank loan with cash flow from its operations, the distribution provisions would not have changed and a PCA obligation still would have arisen if partnership income or cash flow were not sufficient to provide the preferential return to Placid. The limited partners secured their obligations to make the PCA by a pledge of their remaining personal assets. On May 27, 1980, Placid as borrower, FNBD and Morgan as agents, *292 and the Banks as lenders, executed a revolving credit agreement dated as of April 28, 1980 (the "1980 Credit Agreement"), wherein the banks agreed to loan Placid up to $ 1.1 billion, as contemplated in the negotiations. Contribution of Assets to the Partnership
Pursuant to the partnership agreement, PIC, as general partner, made capital contributions to PIL of: (i) certain indebtedness with an aggregate balance of $ 272,706,385.24 payable to Placid from N. B. Hunt and W. H. Hunt (the "Placid Note"); and (ii) an amount of cash necessary from time to time to discharge partnership liabilities and acquire the IMIC assets. PIC's aggregate cash contributions to the partnership during 1980 amounted to approximately $ 552 million. The Placid Note represented a portion of N. B. and W. H. Hunt's respective shares of the loan of approximately $ 312 million under the Master Note, plus accrued interest through May 27, 1980, of approximately $ 9 million. The remaining approximately $ 48 million under the Master Note, as well as the Chicago Notes, were not contributed to the partnership. Lamar Hunt signed the Placid Note, although none of his debts to Placid were included in this Note. This obligation *293 was not recorded as an indebtedness on Lamar Hunt's books and records or on his audited financial statements. In fact, Lamar Hunt signed the Placid Note in error. The $ 272.7 million Placid Note was treated as a liability of only N. B. and W. H. Hunt in the partnership agreement and on the books and records of the partnership. Because the assets contributed to the partnership by N. B. and W. H. Hunt were subject to the Placid Note, the contribution of that Note to the partnership by PIC was intended to and did result in the merger and cancellation of the Placid Note pursuant to the terms of the partnership agreement. On the partnership books, N. B. and W. H. Hunt's capital accounts were reduced by their allocable shares of the Placid Note, and PIC's capital account was correspondingly increased. Lamar's capital account was not affected by the merger and cancellation of the Placid Note. N. B. and W. H. Hunt contributed many assets to PIL, including stock in certain gold mining companies, mineral leases of coal properties, silver bullion, gold coins, silver-alloy coins, silver forward contracts, their respective shares of the Placid Agent Account, a $ 10,000 promissory note, and the *294 net equity of assets held in certain broker's margin accounts. Lamar Hunt contributed $ 2,998, and his one-percent share of a $ 10,000 promissory note. Placid, the Hunts, and the Banks placed an aggregate value of approximately $ 1.044 billion on the assets contributed by the limited partners to PIL during 1980. These assets were contributed subject to aggregate indebtedness of approximately $ 636 million *889 (including the Placid Note), none of which represented obligations of Lamar Hunt. Thus, the limited partners made a net contribution of approximately $ 408 million in assets. From the formation of PIL in 1980 to its termination in 1985, Lamar made no further contributions to the partnership. Partnership Operations
PIL provided a vehicle for the ownership, holding, management, development, and orderly disposition of partnership assets in a manner that afforded Placid a reasonable business opportunity. PIC had exclusive rights of management and control of the business of the partnership, but was required by the terms of the partnership agreement to confer with independent consultants regarding management of the silver. The limited partners had no rights under the partnership *295 agreement to exercise management or control over partnership operations and did not do so. During 1980, PIL set up its books and records, assumed possession and control of the contributed assets and commenced the active management of such assets. The business activities of PIL during 1980 included locating, identifying, and taking possession of all contributed assets. Warehouse receipts evidencing ownership of the silver bullion were verified and arrangements were made to relocate and store the bullion in New York and Delaware. PIL took possession of the silver and gold coins by notifying the banks holding the coins of the change in ownership. In addition, crews were sent to the various storage sites to identify and count the coins, verify their authenticity, and reseal the bags. The coins were all moved to Citibank for storage. PIC also notified brokerage houses that it had powers of attorney to manage N. B. and W. H. Hunt's margin account assets. Brokers were notified that PIL had taken possession of the gold stocks and silver forward contracts. As the forward contracts matured, PIL management decided whether to close out or roll each contract forward, and the brokers were *296 notified accordingly. Placid's land department handled the details necessary for PIL to take control over the coal properties. By agreement effective May 27, 1980, PIL purchased the equivalent of 11,846,512 ounces of silver consisting of silver leases, silver coin options, and silver bullion from IMIC for $ 14.05 per ounce, a total consideration of $ 166,443,493 (including the assumption of liabilities in the amount of $ 7,393,000 due to holders of the silver options). During 1980, PIL sold its gold stocks for $ 113,767,287, giving it a gain of $ 11,345,718. PIL also sold margin account assets for a total consideration of $ 22,606,123 (contribution value of $ 13,877,796) and silver bullion for a total consideration of $ 9,737,943 (contribution value $ 8,942,360), and either took delivery of silver subject to the silver forward contracts or sold or renewed (rolled) such contracts, generating net revenue of $ 3,933,636. The partnership also received $ 6,806,377 in dividends (net of foreign tax withholding) on gold stocks and $ 4,811,584 in interest income on cash deposits. PIL incurred interest expense of $ 1,916,131 and expenses in connection with its business, including storage, *297 moving and insurance costs for the silver coins and bullion, legal and accounting fees, and administrative expenses in the aggregate amount of $ 1,608,540. Thus, net revenues of over $ 32 million were realized by PIL in 1980. PIL also retired approximately $ 363 million of outside debt assumed by the partnership. The spot price of silver rose above $ 15 per ounce and stayed at or was higher than that level through 1980, except for three days in December. On September 22, 1980, the price reached $ 24.25 per ounce. PIL sold only a small amount of silver during 1980 because PIC's management believed and had been advised by its silver consultant that the fundamentals for the price going higher were still in place. However, because of the enormous publicity associated with the 1980 financing and a Congressional inquiry into the transaction, there was a public awareness of the terms and schedule of the implicit liquidation requirement in the agreement. This public awareness depressed the silver market, preventing the silver from achieving what PIL believed to be full value. Pursuant to the partnership agreement, PIL distributed a total of $ 100,109,269.35 in 1980 to the partners as *298 follows: $ 97,213,360.79 to PIC, which constituted its 18-percent return on investment and its return of capital; and a total of $ 2,895,908.56 to the limited partners, their 18-percent return on investment. Late in 1980, Placid began efforts to restructure the 1980 Credit Agreement and the partnership agreement. At the request of Elvis Mason, representatives of FNBD and Morgan met with the Placid board to discuss the liquidation of the PIL silver. This meeting reinforced Placid's belief that the terms of the partnership agreement and 1980 Credit Agreement created pressure for the early (and potentially unprofitable) liquidation of the partnership's silver in order to avoid calling upon the Hunts' illiquid collateral to satisfy their PCA obligation. By letter dated February 9, 1981, Placid approached the Banks and proposed that it be given permission to defer the timing of the Hunts' PCA obligation to allow for a more orderly sale of PIL's silver-related assets. When Placid did not receive a positive response, it attempted to find foreign funds to refinance the 1980 Credit Agreement, but was unsuccessful. *890 Placid also attempted to sell assets to generate funds that could be used *299 to retire the 1980 Credit Agreement, but did not raise sufficient proceeds to pay off the loan. Although the bank loan was amended and restated as of June 1, 1981, the revisions made no change to the basic PCA arrangement. In the fall of 1981, Placid began discussions with officials from RepublicBankDallas, N.A. ("RepublicBank") about refinancing the 1980 Credit Agreement. RepublicBank and Placid sought and received tentative approval of the refinancing from the Federal Reserve Board. During 1981, the spot price of silver began to decline and dropped to $ 8.03 an ounce by November of 1981. As a result, PIL sold no silver bullion in 1981, because Placid management retained their belief the price of silver would rise again. In addition, PIL did not want to compete with the silver sales being made by the General Services Administration of the Federal Government. PIL continued to take possession of, manage, and dispose of assets during 1981 in an effort to maximize profitability. PIL attempted to lease silver for industrial use but was unable to consummate any agreements. During 1982, PIL continued to own and manage its assets. Silver forward contracts were sold at a loss of approximately *300 $ 1,676,000. PIL received interest income of approximately $ 302,000 and incurred expenses in connection with its business of approximately $ 2,676,000, including costs for storage of the silver assets, legal and accounting fees, administrative expenses, and coal lease rental expenses. PIC continued its management of PIL's financial reporting, including preparation of financial statements and periodic reports to the banks. PIL made no distributions from net cash flow in 1982. 1982 Placid Refinancing and Partnership Dissolution
Placid eventually realized that the silver market's awareness of Placid's abbreviated silver liquidation schedule would continue to prevent realization of the full economic benefits originally contemplated at the formation of PIL. However, if silver were not sold, Placid would be obligated by the 1980 agreements to require additional contributions to PIL by the three Hunt brothers under the PCA provisions, which would require the forced sale of the Hunts' illiquid assets at prices below their true economic value. The parties had been attempting to refinance the 1980 Credit Agreement in a manner that would eliminate the perceived interference of its provisions *301 with Placid's management (through PIC) of PIL. This was accomplished in February of 1982 with the closing of the 1982 Credit Agreement with RepublicBank as agent and 20 banks (the "1982 Banks") as participants. The 1982 Banks and the Federal Reserve were aware that Placid intended to modify the partnership agreement to eliminate the PCA obligations as a consequence of the refinancing. With the elimination of the 1980 Credit Agreement, Placid was free to restructure its overall financial and business relationship with the three Hunt brothers. The first step was to renegotiate the terms of the partnership agreement. If the PCA obligations in the partnership agreement had remained in force, the 1982 Banks could still have required Placid to enforce them, creating the problems described above. In addition, Placid wanted to eliminate the silver overhang on the market and to separate, to the extent possible, the business activities of Placid from the business activities of the three Hunt brothers. In order to resolve the situation, Placid therefore proposed that the partners dissolve the partnership. Effective April 1, 1982, the partners entered into an agreement (the "Dissolution Agreement") *302 to (i) cause the dissolution of the partnership, (ii) provide for the liquidation of the assets and winding up of the affairs of the partnership, and (iii) eliminate all income and capital preferences, additional capital contribution requirements, and covenants of the limited partners set forth in the partnership agreement. The Dissolution Agreement provided that the coal properties, with an agreed value of $ 262,244,000, would be distributed to PIC as a return of capital in partial liquidation of its partnership interest and in order to equalize the partners' capital accounts. The silver-related assets were to be liquidated by PIC and cash from those sales divided 50/50 between PIC and the limited partners. The limited partners' respective shares were 25.5 percent to N. B. Hunt, 22.5 percent to W. H. Hunt, and 2 percent to Lamar Hunt. At the time of dissolution, the value of the silver assets remaining in PIL was approximately $ 421 million. Placid realized multiple benefits as a direct result of the Dissolution Agreement. First, PIC received the substantial coal properties in North Dakota free and clear of the provisions of the partnership agreement that had limited their development *303 until after disposition of the other partnership assets. By the Dissolution Agreement, Placid (through PIC) obtained the important right to develop these assets without the participation of N. B. and W. H. Hunt. Placid's management believed in 1982 that there was sufficient potential for development of the coal properties to warrant a value in excess of $ 262 million. Second, dissolution of PIL eliminated the threat of litigation over enforcement of the PCA and averted a Hunt bankruptcy that would have had adverse consequences to Placid, *891 as described above. Third, the silver owned by PIL was released from the publicly known terms of the partnership agreement and the 1980 Credit Agreement, thus eliminating the market overhang that Placid believed had prevented maximization of silver values. PIL remained in existence as a partnership in the process of liquidation until the remaining assets were sold. PIL liquidated its entire inventory of silver during one month in 1984 and 11 months in 1985, with over 53 million ounces being liquidated in 1985. On December 31, 1985, the partners entered into a written acknowledgement that, except for certain assets to be distributed, the liquidation *304 and the winding up of PIL was complete, and with the contemporaneous distribution of the remaining assets, the partnership was finally terminated and liquidated as of that date. Lamar's Basis in His Tampa Bay Soccer Club Stock
On their amended joint Federal income tax return for 1982, Lamar and Norma deducted a loss of $ 969,124, which was allocated to Lamar as a shareholder in the Tampa Bay Soccer Club, Inc. ("Tampa Bay"), a subchapter S corporation, as of year end 1982. Prior to November 3, 1981, Lamar owned 95 percent of the stock of the Dallas Tornado Soccer Club ("DTSC"), a subchapter S corporation that owned and operated a soccer team in the North American Soccer League. On November 3, 1981, the DTSC was merged into Tampa Bay pursuant to the laws of the State of Delaware. In the merger, Lamar received stock in Tampa Bay in exchange for his stock in DTSC. The merger between DTSC and Tampa Bay qualified as a tax-free reorganization pursuant to the statutory merger provisions of section 368(a)(1)(A). The notice of deficiency issued to Lamar and Norma for their taxable year 1982 disallowed $ 210,124 of the $ 969,124 Tampa Bay loss. The notice stated that the loss was limited *305 to Lamar's year-end 1982 basis in the stock of Tampa Bay which, according to the notice, was only $ 759,000. The $ 759,000 figure is shown in the notice as the sum of: (i) Lamar's allocable 95-percent share of the basis of DTSC in the assets transferred in the merger, or $ 252,361; plus (ii) Lamar's capital contributions to Tampa Bay in 1982 which totaled $ 506,638. Immediately prior to the merger of the two soccer clubs, Lamar's basis in DTSC stock was $ 5,025.36. In connection with the merger, Lamar contributed to DTSC certain notes and other receivables from DTSC in the amount of $ 297,465.61. Lamar also assumed and paid certain liabilities of DTSC in the amount of $ 70,900.25, as part of the merger. Immediately following the merger of the two soccer clubs, Lamar's substituted basis in the Tampa Bay stock was $ 373,391.22, which included the sum of his premerger basis in the DTSC stock ($ 5,025.36), the notes and receivables he contributed to DTSC ($ 297,465.61), and the liabilities he paid on account of DTSC ($ 70,900.25). During taxable year 1982, Lamar contributed amounts totaling $ 506,638.85 to Tampa Bay. Those contributions, when added to Lamar's substituted basis of *306 $ 373,391.22, gave Lamar a basis in his Tampa Bay stock at year end 1982 of $ 880,030.07. Notice of Deficiency
Respondent mailed a timely notice of deficiency in the amount of $ 154,919,798.50 to N. B. and Caroline L. Hunt for tax year 1982, in which he made several adjustments to adjusted gross income: (i) an increase in income of $ 383,194,501.81 for cancellation of indebtedness income attributable to the dissolution of PIL; and (ii) an increase in income of $ 1,486,368.12 attributable to disallowed partnership losses. Respondent mailed a timely notice of deficiency in the amount of $ 158,496,452.17 to W. H. and Nancy B. Hunt for tax year 1982, in which he made several adjustments to income: (i) an increase in income of $ 338,112,795.72 for cancellation of indebtedness income attributable to the dissolution of PIL; and (ii) an increase in income of $ 1,325,916.00 attributable to disallowed partnership losses. Respondent mailed a timely notice of deficiency in the amount of $ 550,377.55 to Lamar and Norma Hunt for tax year 1982, in which he made several adjustments to income: (i) an increase in income by $ 30,054,470.74 for cancellation of indebtedness income attributable to the *307 dissolution of PIL; and (ii) an increase in income by $ 115,116 attributable to disallowed partnership losses; (iii) allowed an adjusted loss of $ 759,000 from the Tampa Bay Soccer Club; and (iv) reduced allowable real estate expenses by $ 12,579.64. OPINION I. Cancellation of Indebtedness Income
A. Partnership Issue Respondent initially contends that petitioners have cancellation of indebtedness income in the amount of $ 738,384,865. [4] *308 His initial theory is based on the premise that no partnership existed and that the three Hunt brothers were therefore *892 liable, in varying amounts, for the entire existing remaining indebtedness of Placid. Therefore, we must first decide whether PIL was, in fact, a bona fide partnership. Section 761(a) provides that:
the term "partnership" includes a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not * * * a corporation or a trust or estate. * * *
The Supreme Court has examined the facts and circumstances attendant to the formation and operation of the partnership in an effort to determine the intent of the parties:
The question is * * * whether, considering all the facts -- the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent -- the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * * [Commissioner v. Culbertson, 337 U.S. 733, 742 (1949).]
The Tax Court has also focused on certain factors as relevant to determining whether a partnership exists:
The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and *309 coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised mutual control over and assumed mutual responsibilities for the enterprise. [Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1967).]
1. Formal Indicia of Partnership N. B., W. H., Lamar, and PIC (Placid's wholly-owned subsidiary) entered into a formal partnership agreement, the execution of which suggests that the parties intended to enter into a bona fide partnership. S. & M. Plumbing Co. v. Commissioner, 55 T.C. 702, 707 (1971). The agreement provided for: (i) the contribution of significant amounts of capital by both Placid and the Hunts; (ii) the management and control of PIL's assets; (iii) the sharing of profits and losses from the business; (iv) the manner and *310 order of cash distributions by PIL; and (v) the allocation for Federal income tax purposes of income, gain, loss, deductions, and credits resulting from such operations. Certificates of limited partnership were filed with the Secretaries of State in Texas and North Dakota. The partners held their arrangement out to third parties, such as the Banks, the Securities and Exchange Commission, the CFTC, the Internal Revenue Service, and various brokerage houses as a partnership. PIL took physical possession and title to all the assets contributed to the partnership by N. B. and W. H. PIC, as general partner, then managed these assets. PIC, the general partner, actively maintained the books and records of the partnership, PIL, and filed Federal income tax returns on behalf of PIL as a partnership. 2. Capital Contributions Through its subsidiary, PIC, Placid contributed $ 551,528,067 in cash to PIL, plus the Placid Note of $ 272,706,385. PIC also contributed substantial services to PIL, in its capacity as general partner. These services included managing PIL's operations on a daily basis as well as disposing of its assets. N. B. and W. H. Hunt contributed various assets to PIL, including *311 stock in certain gold mining companies, mineral leases encompassing twelve separate coal fields in North Dakota, gold coins, silver-related assets, and other assets. Lamar contributed $ 2,998 to PIL, and his one-percent share of a $ 10,000 promissory note. The capital account of a partner is determined and maintained pursuant to section 1.704-1(b)(2)(iv), Income Tax Regs. For purposes of that paragraph, the fair market value assigned to property contributed to a partnership is assumed correct, as long as that value is reasonably agreed to among the partners in arm's-length negotiations and the partners have sufficiently adverse interests. Sec. 1.704-1(b)(2)(iv)(h), Income Tax Regs.
Petitioners and respondent have presented numerous expert reports to assist us in deciding whether the values assigned to the assets contributed to PIL were reasonable. Petitioners presented the expert report of Dr. Michael Gibbons, a professor of economics at the Wharton School of Business, University of Pennsylvania. Gibbons is an expert in the fields of economics and finance, specializing in econometrics and financial economics. *893 Gibbons' expert report concludes that the April 28, 1980, formation *312 date of the partnership was the relevant date on which to value the silver assets. The report notes that the spot price for silver closed at $ 14.90 on Friday, April 25, 1980, the last business day before the effective date of the PIL agreement. The average closing price in the spot market for silver for the five days ending April 25, 1980, was $ 14.44 per ounce. The average closing price in the spot market for the ten days ending April 25, 1980, was $ 14.16. Gibbons concludes that the value given to the silver for valuation purposes at the time of partnership formation, $ 14.05 per ounce, was reasonable. Dr. Gibbons also concluded that PIC, the general partner, and the three Hunt brothers, limited partners, could reasonably have expected to earn large profits in the likely event that silver prices increased. Gibbons noted that silver prices did increase significantly in the latter part of 1980. Gibbons found that, as of April 28, 1980, the probability of exceeding $ 15.33 per ounce by September 22, 1980, was very high. The price of silver exceeded $ 15.33 per ounce as early as June 5, 1980, and consistently remained above that price from July 21, 1980, through December 10, 1980. *313 The spot price for silver exceeded the contribution value of $ 14.05 on June 2, 1980, and stayed above that level for the rest of 1980. The Gibbons report also found no evidence to support the proposition that a discount should have been applied to the value of the contributed silver, given the effect that the unloading of a large amount of silver would have on the market. Gibbons opined that there was little reason to impose such a price discount, so long as the partnership provided for the orderly disposition of their silver assets. Respondent presented the expert report of Professor Raymond P. H. Fishe, an associate professor of economics at the University of Miami. Applying a 37.75-percent discount to the Handy & Harmon Base price (a commonly-used published price guide) for silver of $ 13.65 on April 28, 1980, Dr. Fishe concludes that the market value for the silver contributed to PIL was $ 8.50 per ounce. The discounts employed were determined by examining the elasticity of the silver market at the various dates to determine the impact on the price of silver of selling the 60 million ounces of silver within a short period of time. In the event that an adjustment need be made *314 to account for the market's expectation of a sale of silver by PIL, a discount rate of 24.02 percent is applied, resulting in a value of $ 10.37 per ounce on April 28, 1980. Petitioners retained Dr. Martin Baughman, Dr. Willem van Rensburg, and Neil Eisner as experts to testify and submit reports in support of Placid's in-house valuation of the North Dakota lignite properties that were contributed to PIL. Dr. Baughman is an associate professor of electrical and computer engineering at the University of Texas and has taught, published, and been engaged as a consultant on the economics of energy resource development. Neil Eisner works with an investment banking and financial consulting firm and specializes in energy resource companies. In addition, from December 1980 to February 1982, he served as Chief Financial Officer of the United States Synthetic Fuels Corporation. From April 1982 to September 1983, Eisner worked as the financial advisor to the Chairman of the U.S. Synthetic Fuels Corporation. Dr. van Rensburg is a professor of petroleum engineering and geological sciences at the University of Texas. Dr. van Rensburg has taught, had writings published, consulted, and had substantial *315 experience in coal reserve estimation and synthetic fuels development. For purposes of valuing the North Dakota lignite properties, Baughman, van Rensburg, and Eisner co-authored a report, which arrives at the following conclusions: (i) the properties contributed to PIL contained lignite reserves of 1.8 billion tons; (ii) the original estimate of the reserves that was prepared by Hunt Energy was developed in accordance with general industry standards and practices; and (iii) the average quality of PIL's lignite reserves in terms of proximate and ultimate analyses, ash composition, fusion characteristics, and trace elements content, was typical of North Dakota lignites. They also found that these reserves are nearly identical to the lignite successfully tested in Sasolburg, South Africa and subsequently used at synfuel projects in the United States. Their report noted that world events and developments in energy in the early 1980's led to the expectation of sustained shortages and long-term price increases in all forms of energy. The report finds that one of the first synfuels projects, the Great Plains Gasification Project, which was jointly owned by Tenneco, American Natural, MidCon, *316 Transco, and Pacific Lighting, was under construction in North Dakota in 1980. It received a $ 1.2 billion Federal grant which closed in January 1982. In April 1982, the highest and best use of lignite located in North Dakota was as a feedstock for synthetic fuels manufacture and associated electric power generation. The lignite reserves contributed to PIL were in the vicinity of the Great Plains Gasification Project. The report ascertained a value for the North Dakota lignite reserves in two ways: (1) it examined the capitalization of income from development of the lignite properties, and (ii) the report studied comparable sales of North Dakota lignite for both 1980 and 1982. The *894 capitalization of income method of valuation, dependent upon the development of the lignite properties in 1980, yielded an expected value of approximately $ 550 million, or $ 0.31 per ton. The comparable sales method of valuation came up with values ranging from $ 0.18 to $ 0.28 per ton in 1980. In 1982, capitalized income from the development of the lignite was approximately $ 446 million, or about $ 0.25 per ton. Comparable sales found in 1982 ranged from $ 0.15 to $ 0.20 per ton. On the basis of *317 the prices per ton derived from the capitalization of income and comparable sales approaches, the report concludes that PIL had a substantial opportunity for profits, based on the value of $ 294 million assigned to the lignite properties at their contribution in 1980. The report also concludes that the fair market value of the lignite reserves exceeded the $ 262 million value assigned in 1982, when they were transferred from PIL to Placid. Respondent presented Michael G. Jaron and Vince Joyce as experts concerning the value of the North Dakota lignite. Jaron is a geologist and was a vice president of American Natural Resources Company from 1970 through 1980, during which time he was responsible for planning, construction, and operation of coal processing plants and coal mines. Joyce is a mining engineer who worked for American Natural Resources Company from 1977 through 1980. Both Jaron and Joyce opined that none of the North Dakota lignite in question could have been mined and sold at a profit under the market conditions that existed in 1980 and 1982. They classified the unminable lignite as sub-economic resources, not reserves. In addition, portions of the PIL lignite were not *318 minable because of environmental considerations and the site of the PIL lignite was not a feasible spot in which to place an electric generating plant or a synfuels plant due to the distance from a large, reliable water supply. Joyce and Jaron were of the opinion that North Dakota lignite mines are high volume, low cost operations and that 95 percent of all the lignite mined in North Dakota was sold under long-term contracts for electric generation. They noted that with the exception of one small generating plant, no new steam-electric plants were projected for North Dakota in 1980 and 1982. Jaron and Joyce pointed out that transportation of lignite also posed a problem, given lignite's characteristic properties, such as moisture content, spontaneous combustion, fugitive dust emissions, and freezing. These properties limit shipment of lignite to three or four hundred miles, thus limiting the market for such lignite to customers in a narrow and sparsely populated area. Having evaluated the reports and testimony of such experts, we find that the values attributed to all of the assets that were contributed to PIL were reasonable. We find that the Hunt brothers dealt with Placid on *319 an arm's-length basis; they did not control Placid, an independent economic entity owned by six trusts. Furthermore, the beneficiaries of the trusts approved the transaction after having had it fully explained to them. Their interests lay in the protection and development of Placid, not the individual Hunt brothers. Having concluded that the fair market values assigned by the partners were, in fact, reasonable, we need not second-guess the parties by conducting our own determination of the contributed assets' precise fair market values. 3. Management and Control PIL actively managed the partnership assets during its two years of operation. After taking title and possession of the contributed assets, including approximately 63 million ounces of physical silver, PIL arranged for the relocation and storage of the silver bullion and silver and gold coins. In an attempt to raise partnership revenues, PIL entered into industrial leases of its physical silver and actively managed its gold stocks and margin account assets. During 1980 through 1982, PIL incurred expenses of approximately $ 7,693,000 for storage, moving, and insurance costs for the silver and gold coins and silver bullion, *320 leasehold expenses for the coal properties, legal and accounting fees, and administrative expenses. 4. Sharing of Profits and Losses Respondent argues that Placid was a creditor of the partnership in that Placid had a guaranteed return of 98 percent of its capital contribution under the terms of the PIL agreement and also received a guaranteed 18-percent return on its contribution. Respondent also contends that the 18-percent return Placid received, which was secured by virtually all of the assets of the limited partners, was analogous to interest. This Court has held that a partnership, as opposed to a debtor/creditor relationship, existed where one partner was entitled to receive his capital contribution, as well as a percentage return thereon. In Hartman v. Commissioner, T.C. Memo. 1958-206, a taxpayer was held to have entered into a joint venture to operate a ferry in spite of the fact that his agreement with the other party referred to him as a "lender." The taxpayer signed an agreement by which he gave $ 5,000 to the Parkersburg Transit Company to fund the operation of a ferry service. The agreement provided that the Transit Company would pay all of its net profits to the *321 taxpayer until his initial contribution had been repaid. The agreement also provided for interest to be paid on the *895 $ 5,000 until the Transit Company had repaid it in full. After the taxpayer's $ 5,000 contribution had been repaid, the Transit Company and two parties were to split the profits on an equal basis. This Court held that the agreement "indicate[d] a proprietary interest in the profits as profits" and that the arrangement did not constitute a debtor/creditor relationship. Hartman v. Commissioner, supra.
The PIL partnership agreement provided that PIC and the limited partners were to receive a primary cumulative return on investment of 18 percent, followed by a return of Placid's capital contributions before PIC and the limited partners received secondary cumulative returns of 26 percent and 25 percent, respectively. That was to be followed by a return of the limited partners' capital contributions. The above arrangement provided Placid with financial incentive to enter into the partnership arrangement with the limited partners. The return of Placid's capital contribution does not render null and void an otherwise bona fide partnership relationship. Had the partnership *322 liquidated its silver holdings in the fall of 1980, the distribution scheme could have yielded healthy profits for PIC and the limited partners and would have returned to them their capital contributions. Petitioners correctly point out that the limited partners' obligation under the partnership agreement to guarantee a return of 98 percent of Placid's capital contribution plus an 18-percent return thereon by way of the periodic contribution amounts was not inconsistent with the status of the arrangement as a partnership for Federal income tax purposes. A case decided by this Court dealing with a similar guarantee of a capital contribution is Investors Insurance Agency, Inc. v. Commissioner, 72 T.C. 1027 (1979), affd. 677 F.2d 1328 (9th Cir. 1982), in which the taxpayer and a corporation entered into a joint venture agreement which provided for 6-percent interest on amounts advanced by the taxpayer to the corporation and for distributions to be made first to the taxpayer in an amount equal to its contribution. The stockholders of the corporation then executed a guaranty providing that if the joint venture failed to make distributions by a certain time, the stockholders would be *323 obligated to pay the taxpayer its initial investment plus 6-percent interest from the date of the venture's formation. This Court first looked to the legal relationship between the taxpayer and the guarantor-stockholders of the corporation and determined that it was a joint venture, not a debtor/creditor relationship. The Court then held that, although the stockholders referred to themselves as "guarantors," there was no loan and "any transfer of money by the joint venture to [the taxpayer] would have been treated as a distribution, not a payment of interest." Investors Insurance Agency v. Commissioner, 72 T.C. at 1031. In the instant case, the limited partners were only liable to make periodic contributions when the income from PIL was unable to satisfy the primary preference scheme. The PCA was based on a payment of partnership contributions to PIL and did not constitute repayment of indebtedness from the limited partners to Placid. It was a contractual requirement based on a contingency, not a fixed indebtedness to pay a certain amount of money at a certain time. 5. Business Purpose Finally, we look to the business purpose for which Placid and the limited partners entered into *324 the PIL Partnership Agreement. It is clear that W. H. and N. B. Hunt were in dire need of capital to refinance their massive silver-related debt. Lamar also had margin account debt, although in a reduced amount. Therefore, the motivation of the Hunts to enter into a partnership was to refinance their silver-related debts. This Court has held that the refinancing of debt is a valid business purpose for forming a partnership. In Delchamps v. Commissioner, 13 T.C. 281, 287 (1949), we held:
The purpose in forming the partnership was the reasonable and necessary one of securing substantial loans from the banks in order to make the current financial position of the business more secure and to protect the credit standing of the business. Although other means might have been employed to accomplish this purpose, the partners in good faith believed that the formation of the partnership was the most advantageous one for the business. The accomplishment of this purpose is a fact which may not be disregarded. Hartz v. Commissioner, 170 Fed. (2d) 313; certiorari denied, 337 U.S. 733. * * * We conclude from all the facts that a bona fide partnership was well established on the grounds of contributions *325 of capital and credit. There was a real and true intention to create a bona fide partnership to make the resources of the two wives available for the support of the credit position of the business. The partnership must be recognized as real within the meaning of the Federal revenue laws. * * *
W. H. and N. B. were also motivated to enter into the partnership with Placid for the purpose of waiting for the price of silver to climb back to and surpass the higher levels that it had previously seen. As the record demonstrates, many people knowledgeable in the silver market thought that the price of silver would soon revisit higher levels. N. B. and W. H. looked at *896 the partnership agreement as a means of keeping their silver investment alive, even though the partnership agreement would force them to split their profits with Placid when the price of silver rose. Placid, too, had numerous reasons to enter into a partnership agreement with N. B. and W. H. Placid was aware of the public's (erroneous) perception that N. B., W. H., and Lamar directly controlled Placid. Although Placid was owned by six trust estates and not the three brothers, Placid was extremely concerned that bankruptcy *326 filings by N. B. and W. H. might adversely affect Placid's business relationships and credit ratings. Although concern over possible bankruptcy filings was Placid's primary motivation for entering into the partnership agreement, Placid thought that the assets that N. B. and W. H. contributed to PIL had significant appreciation potential and that Placid might profit handsomely from such a venture. Placid had previously made an unsuccessful bid for Gulf Resources, primarily for its substantial silver holdings. Placid also extensively studied the profit potential of lignite coal. The North Dakota lignite fields presented profit possibilities for Placid in 1980 and 1982. Having established that Placid and the limited partners had a business purpose in entering into the PIL partnership, we address respondent's assertion that the PIL transaction was a "sham." In order to find PIL a sham, we employ a two-part test: To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists. *327 * * * [Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), affg. as to this issue 81 T.C. 184 (1983).]
On the basis of our finding of substantial business purpose for both parties entering into the PIL partnership agreement, we cannot find that any of the parties were motivated only by the possibility of obtaining tax benefits. Furthermore, the possibility of PIL's generating a profit for its partners was very real. We conclude that PIL was a valid partnership for Federal income tax purposes. Respondent's claim that PIL was a mere financing arrangement with no economic substance is dismissed. Therefore, petitioners did not realize cancellation of indebtedness income upon PIL's dissolution in 1982. In addition, petitioners are entitled to deduct PIL losses that flowed through to them to the extent they are otherwise deductible. See section II, infra. B. Alternative Cancellation of Indebtedness Income Theories Respondent next argues that, even if PIL is found to be a valid partnership, the three Hunt brothers received constructive dividends from Placid when they were relieved of their obligation to make $ 174 million in periodic contribution payments. Respondent *328 bases this theory on the premise that the three Hunt brothers effectively controlled Placid and thereby relieved themselves of their contingent liability. Respondent's final alternative argument is that, even if PIL is a valid partnership, the three Hunt brothers were liable for the $ 174 million in unpaid primary preferences, as well as the Placid Note of $ 272,706,385, which existed prior to the formation of PIL and was contributed by Placid to PIL. Under this argument, respondent contends that the three Hunt brothers realized substantial amounts of income from cancellation of indebtedness in 1982 as follows: $ 228,246,420.71 to N. B., $ 201,393,900.63 to W. H., and $ 17,901,680.06 to Lamar.
Gross income includes all income from whatever source derived, including income from the cancellation of indebtedness. Sec. 61(a)(12). However, not all discharges of indebtedness must be included in gross income. Sec. 1.162-12(a), Income Tax Regs.; Zarin v. Commissioner, 92 T.C. 1084, 1089 (1989). Specifically, this Court has held that the release of a contingent liability does not result in cancellation of indebtedness income. In Landreth v. Commissioner, 50 T.C. 803 (1968), we addressed *329 this issue and concluded as follows:
If the respondent intends to suggest that any person who guarantees the payment of a loan realizes income when the principal debtor discharges the loan, we reject the proposition. The respondent cites, and we have found, no authority for the proposition that a guarantor constructively receives income when the debtor makes payments to the creditor on his obligation, and we think that it has no foundation in the principles of tax law. The situation of a guarantor is not like that of a debtor who as a result of the original loan obtains a nontaxable increase in assets. The guarantor obtains nothing except perhaps a taxable consideration for his promise. Where a debtor is relieved of his obligation to repay the loan, his net worth is increased over what it would have been if the original transaction had never occurred. This real increase in wealth may be properly taxable. United States v. Kirby Lumber Co., 284 U.S. 1 (1931). However, where the guarantor is relieved of his contingent liability, either because of payment by the debtor to *897 the creditor or because of a release given him by the creditor, no previously untaxed accretion in assets thereby *330 results in an increase in net worth. Commissioner v. Rail Joint Co., 61 F.2d 751 (C.A. 2, 1932); Fashion Park, Inc., 21 T.C. 600 (1954). Payment by the principal debtor does not increase the guarantor's net worth; it merely prevents it, pro tanto, from being decreased. The guarantor no more realizes income from the transaction that he would if a tornado, bearing down on his home and threatening a loss, changes course and leaves the house intact. * * * [Landreth v. Commissioner, 50 T.C. at 812-813.]
Even assuming, arguendo, that the PCA represented true debt, it was a contingent liability in that it bound the three limited partners only in the event that the partnership income was insufficient to meet partnership expenses. Since the three brothers were never called upon to make these payments, the PCA remained a contingent liability. At the dissolution of PIL in 1982, Placid, the "creditor," chose not to look to the limited partners to make their PCA payments. Placid had good business reasons for not forcing the limited partners into paying their PCA obligations. Forcing the limited partners to pay would have caused them to seek the protection of the bankruptcy laws, causing damage *331 to Placid's business relationships and credit. Placid also had an opportunity to profit handsomely from its retention of substantial silver assets which were depressed at that time. The receipt of the North Dakota lignite reserves also served to even up the accounts and gave Placid another opportunity to profit. None of the three Hunt brothers, as limited partners, had cancellation of indebtedness income as a result of his release from the contingent PCA obligation, which, as we have opined earlier, was not true debt in the sense of section 61, but only a contingent contract requirement to make capital contributions. With respect to respondent's contention that the contribution of the $ 272.2 million Placid Note to PIL resulted in its cancellation, and that N. B., W. H., and Lamar are liable for cancellation of indebtedness income on the basis of their agreed partnership share percentages, we have found that the Placid Note was canceled after Placid contributed it to PIL. The assets contributed by N. B. and W. H. were subject to the Placid Note. Accordingly, the capital accounts of N. B. and W. H. were reduced by their allocable shares of liability for the Placid Note and PIC's *332 capital account was increased by the same amount. All this occurred upon the formation of PIL in 1980. We also found as fact that Lamar did not receive any of the proceeds of the Placid Note and that he signed it by mistake. Having decided that neither the contingent PCA obligations nor the contribution of the Placid Note to PIL resulted in cancellation of indebtedness income to petitioners in 1982, we conclude that petitioners are not liable for income tax based on respondent's two alternative theories. II. At Risk Consideration
In his statutory notice of deficiency to Lamar and Norma Hunt, respondent contends that, even if PIL was a valid partnership for Federal income tax purposes, petitioners Lamar and Norma Hunt were nonetheless not entitled to deduct losses in excess of the amount they were "at risk," within the meaning of section 465. Petitioners Lamar and Norma Hunt failed to address this issue in their pleadings, at trial, or on brief. We therefore conclude that petitioners Lamar and Norma Hunt have failed to carry their burden of proof with respect to the at risk issue. Rule 142(a). Respondent first raised his at risk theory with respect to N. B. and W. H. Hunt in his *333 trial memorandum. This Court has repeatedly held that it will not consider issues that have not been properly pleaded. Estate of Mandels v. Commissioner, 64 T.C. 61, 73 (1975); Markwardt v. Commissioner, 64 T.C. 989, 997-(1975). The question of whether an issue was properly raised depends on whether petitioners N. B. and W. H. received fair notice of respondent's raising of the at risk issue. By raising the at risk issue for the first time only 10 days before trial, respondent clearly failed to give fair notice to petitioners N. B. and W. H. Hunt. Since the at risk issue was not properly before this Court with respect to N. B. and W. H. Hunt, we refuse to address it. III. Tampa Bay Soccer Club Loss
In his statutory notice of deficiency, respondent allowed a loss to Lamar of $ 759,000 from the operation of the Tampa Bay Soccer Club. After reviewing the documents submitted on Lamar's behalf, respondent enlarged the allowable loss to $ 809,129.82. Lamar, however, claims that he was entitled to deduct $ 880,030.87. DTSC was merged into the Tampa Bay Soccer Club in 1981, pursuant to a statutory merger. Lamar contends that respondent failed to take into account $ 70,900 (the difference *334 between $ 880,030.87 and $ 809,129.82) that he paid as liabilities of the DTSC, which should have been included in the basis of his DTSC stock. We have found that the exchange of Lamar's DTSC stock for Tampa Bay stock qualified for nonrecognition treatment under section 354(a)(1). Pursuant to section 358(a), if stock is *898 obtained in an exchange to which section 354 applies, the basis of the stock received is equal to the basis of the stock exchanged. Therefore, the basis of Lamar's Tampa Bay stock should equal his basis in the DTSC stock, which he exchanged for the Tampa Bay stock, plus later additions to basis in the year. The only amount in dispute is $ 70,900 that respondent did not allow Lamar to add to his stock basis. On the basis of the testimony and evidence presented, we conclude that Lamar met his burden of proof and had a 1982 year-end basis in his Tampa Bay stock of $ 880,030. IV. Lamar's Real Estate Expenses
In his notice of deficiency, respondent found that Lamar and Norma failed to establish their right to claim real estate expenses of $ 12,579.64. Petitioners have not presented any evidence and consequently fail in their burden of proof on this issue. Rule 142(a). *335 We uphold respondent's determination that petitioners Lamar and Norma Hunt are not entitled to deduct this amount for tax year 1982. V. Respondent's Objections to Procedural Decisions
A. Testimony and Expert Report Concerning Beaufort Sea Property Respondent contends that our decision to exclude expert testimony and expert reports concerning the value of the Beaufort Sea property was erroneous. Respondent states that such evidence is relevant because it supports his determination that there was income from the forgiveness of indebtedness upon the execution of the dissolution agreement in 1982. He contends that the valuation evidence concerning the Beaufort Sea properties should also have been admitted as evidence tending to show that PIL did not constitute a bona fide partnership for Federal income tax purposes. This Court denied respondent's pretrial motion to amend his answer to assert an additional deficiency on the grounds, not contained in the statutory notice of deficiency herein, that the "exchange of recourse, interest-bearing notes [the "Hunt Notes"] secured by virtually all of Petitioners' assets for a nonrecourse, non-interest bearing note secured only by the Beaufort *336 Sea properties with little or no value" resulted in additional cancellation of indebtedness income to petitioners. Rule 401, Federal Rules of Evidence, which is applicable in the Tax Court pursuant to Rule 143 and section 7453, provides that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Armco, Inc. v. Commissioner, 87 T.C. 865, 867 (1986). We did not allow respondent to amend his answer by asserting an additional basis of deficiency concerning alleged cancellation of indebtedness income resulting from an exchange of Beaufort Sea leases for the cancellation of debt. Absent such an amendment by respondent, the value of the Beaufort Sea leases is simply not relevant in this case. Allowing respondent to introduce evidence concerning the value of these leases would allow respondent to introduce his new theory of deficiency by the back door, effectively circumventing this Court's refusal to allow respondent to make an untimely amendment to his answer on the eve of trial. Moreover, respondent is attempting to "bootstrap" *337 his ongoing case against Lamar for tax year 1985, the year in which Lamar transferred his interest in the Beaufort Sea properties to Placid in release of his promissory note. We hold that evidence concerning the value of Beaufort Sea properties is relevant, if at all, to determine whether or not Lamar had cancellation of indebtedness income in tax year 1985, not 1982. B. Denial of Respondent's Motion to Compel Production of Documents
This Court denied respondent's Motion to Compel Production of Documents on June 21, 1989, as well as respondent's renewal of that motion. Respondent claims in his post-trial brief that this Court's failure to enforce the production of documents frustrated compliance with Rule 91 and prejudiced respondent in his trial preparation and presentation. We must conclude that petitioners substantially complied with respondent's informal requests for documents and did so in a timely fashion. Respondent should have made more effective use of the discovery process by filing reasonable requests for document production and motions for enforcement thereof, in a more timely fashion. Denial of respondent's motions to compel production of documents was proper; waiting *338 until 19 days before trial began on July 10, 1989, to request such an order enforcing discovery was not timely. Rules 70(a)(2), 104(b). C. Propriety of Granting Motions to Quash Subpoenas
Respondent issued numerous subpoenas duces tecum to third-party banks and others shortly prior to trial. The subpoenas uniformly demanded that the subpoenaed individuals and records be present at Washington, D.C., on July 10, 1989, the first day of what became a 19-day trial. Each subpoena demanded a large number of documents having to do with the revolving credit agreements between Placid and the bank group, including appraisals involving assets *899 pledged as security, ledgers reflecting the accrual of interest and penalties, memoranda, and letters relative to the credit agreement and information concerning discussions with Paul Volcker, members of the Federal Reserve Board, and the Comptroller of the Currency. The subpoenas also required the attendance of former and current officers, and other employees of banks in various parts of the country, principally Texas and New York. After a lengthy hearing, this Court on June 30, 1989, granted third-party motions to quash respondent's subpoenas on several *339 grounds, namely that they were: (i) overbroad, vague, and over-reaching; (ii) unnecessarily duplicative, given that they each asked for largely identical documents; (iii) unduly oppressive and burdensome on the third-party recipients; and (iv) an impermissible attempt to circumvent the discovery rules of this Court. Rule 147(b) provides that this Court, upon receiving a motion, may quash or modify the subpoena if it is unreasonable and oppressive. This Court must prevent parties from misusing its power to compel witnesses to travel great distances, wait for indefinite periods, and produce reams of documents when these actions are simply unnecessary. Enforcement of respondent's subpoenas would have resulted in a chaotic atmosphere, causing great inconvenience for many persons for little or no gain. This Court attempts to accommodate reasonable requests to subpoena documents and witnesses when necessary; in this case, however, respondent simply cast an all-encompassing net in the search for information with which to build a case. Rule 147 was not intended to serve as a dragnet with which a party conducts discovery. Durkin v. Commissioner, 87 T.C. 1329, 1402-1403 (1986), affd. 872 F.2d 1271 (7th Cir. 1989). *340 We conclude that respondent's subpoenas were unreasonable, oppressive, and accordingly they were quashed. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners were consolidated for trial, briefing, and opinion: N. B. and Caroline L. Hunt, docket No. 10141-88; and W. H. and Nancy B. Hunt, docket No. 10142-88.↩
2. For a detailed discussion of the silver markets and the events that culminated in the decision to enforce position liquidation trading only, see Hunt v. Commissioner, T.C. Memo. 1989-335, 57 T.C.M. 919↩, 923-935.
3. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
4. Respondent calculates this amount as follows: Outstanding principal indebtedness of Placid, $ 924 million, less coal properties valued by respondent at $ 222,279, and the one-half interest in silver assets received by Placid, $ 185,392,856.