T.C. Memo. 2014-191

UNITED STATES TAX COURT

HOWARD W. MYLANDER AND JACQUELYN L. MYLANDER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22283-12.                    Filed September 17, 2014.

Steven E. Alkire, for petitioners.

Kimberly L. Clark and Nhi T. Luu, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies of $10,168 and

$35,000 and section 6662(a) accuracy-related penalties of $2,034 and $7,000 in

petitioners' Federal income tax for 2009 and 2010, respectively.[1]  After

_____

[1]  Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect for the years in issue, and all Rule references are to the

(continued...)

[*2] concessions,[2] the issues for decision are: (1) whether petitioners are entitled to deduct $6,535 for continuing dental education (CDE) expenses under section 162 for 2009; (2) whether petitioners are entitled to deduct an additional $2,652 for rental real estate expenses under section 212 for 2009; (3) whether petitioners failed to report $102,000 of cancellation of indebtedness (COD) income for 2010; and (4) whether petitioners are liable for accuracy-related penalties under section 6662(a) for 2009 and 2010.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Idaho at the time they filed the petition.

---

[1] (...continued)
Tax Court Rules of Practice and Procedure. All monetary amounts have been rounded to the nearest dollar.

[2] Respondent disallowed $2,531 and $8,447 in travel expense deductions that petitioners claimed on their Schedules A, Itemized Deductions, for 2009 and 2010, respectively. Respondent also disallowed deductions of $14,329 for supplies and $12,072 for other expenses claimed on petitioners' 2009 Schedule C, Profit or Loss From Business. Petitioners concede that they were not entitled to any of these deductions, but they do not concede the associated accuracy-related penalties.

**[\*3]** I.      CDE Expenses

In 2009 and 2010 Howard W. Mylander (Dr. Mylander) worked as a dentist for the Baker Dental Group, P.C., in Baker City, Oregon.  His wife, Jacquelyn L. Mylander, was a homemaker.  They lived together in Nampa, Idaho, which is approximately 110 miles from Baker City, Oregon.

During the years at issue, Dr. Mylander was licensed to practice dentistry in Oregon and was a member of the American Dental Association (ADA).[3]  In order to maintain his Oregon dentistry license as well as his membership in the ADA, Dr. Mylander was required to complete 40 hours of CDE each year.  He generally met his CDE requirements by attending meetings of the Eastern Oregon Dental Society, by reading professional journals and taking exams based on the articles, and by attending various dentistry courses.  Dr. Mylander fulfilled his CDE requirements for 2009.

II.      Rental Expenses

In 2009 petitioners, Mrs. Mylander's sister Joy Lehman, and Mrs. Lehman's husband[4] co-owned a house in McCall, Idaho (McCall property).  The McCall

---

[3]  Dr. Mylander was previously licensed to practice in Idaho, but his Idaho license was inactive during the years at issue.

[4]  Mrs. Lehman's husband's name does not appear in the record.

[*4] property was in a recreational area offering a variety of outdoor activities including skiing, snowmobiling, water sports, and hiking. Petitioners and the Lehmans rented out the McCall property as a short-term vacation rental, generating $7,115 in rental income for 2009. Petitioners and the Lehmans shared the rental income evenly, and petitioners reported $3,557 of rental income for 2009.

Mrs. Mylander and Mrs. Lehman maintained a joint bank account (McCall account) that was used exclusively to pay the expenses relating to the McCall property. Every month petitioners and the Lehmans each deposited $250 into the McCall account. In 2009 Mrs. Lehman made payments from the McCall account totaling $5,288 for city services, utilities, insurance, and taxes, and she recorded these rental expenses in a ledger. In addition to the aforementioned expenses, petitioners paid $7,364 for various repairs and improvements to the McCall property during 2009 from their own accounts.

III.  Guaranty Transactions

Sometime in the 1980s, petitioners were involved in a real estate development project in Fairfield, Idaho, called Hidden Paradise Ranch (Hidden

[*5] Paradise).[5]  Petitioners invited Glenn Koch, a businessman and a friend of Dr. Mylander, to invest $400,000 to help finance the construction of a golf course in Hidden Paradise.  After reviewing the project Mr. Koch agreed to invest provided that petitioners personally guaranteed his investment.  Petitioners promised to pay Mr. Koch $400,000 in the event that Hidden Paradise went under, and Mr. Koch then invested the $400,000.  The Hidden Paradise project subsequently failed, and Mr. Koch did not receive any returns on his $400,000 investment.  Mr. Koch then sought payment from petitioners for the $400,000 (Koch debt).

Around the same time, petitioners met Rodney and Katherine Ledbetter (Ledbetters).  The Ledbetters had engaged in an unrelated business venture with a man named Hershell Murray.  That venture failed sometime in the late 1980s.  In 1989 the Ledbetters filed for bankruptcy in the U.S. Bankruptcy Court for the District of Nevada (bankruptcy court).  Mr. Murray filed a claim against the Ledbetters in the bankruptcy action alleging that the Ledbetters had defrauded him of money.  Mr. Murray and the Ledbetters reached an agreement whereby Mr. Murray agreed to settle his claim in the bankruptcy action in exchange for $500,000 in promissory notes from the Ledbetters.  Under the terms of the

---

[5]  The record is unclear and we do not reach any findings of fact regarding the extent to which Mrs. Mylander and Mrs. Ledbetter were involved in the transactions described in this section.

[*6] promissory notes, the Ledbetters were jointly and severally liable to Mr. Murray for $500,000, plus interest, over five years. Mr. Murray conditioned the deal on petitioners' guaranteeing $300,000 of the $500,000 debt.

Mr. Ledbetter convinced petitioners to guarantee the $300,000 by promising to pay off the Koch debt. Mr. Ledbetter owned a convenience store in Nevada (Nevada store), which he led petitioners to believe was worth at least $400,000 and could be transferred to Mr. Koch to satisfy the Koch debt in full. Mr. Ledbetter also promised to indemnify petitioners for any payments they made to Mr. Murray under the guaranty. With petitioners on board, the Ledbetters entered into a stipulation agreement with Mr. Murray to pay the $500,000, plus interest, over five years.

The bankruptcy court issued an order which incorporated the terms of the stipulation and confirmed the Ledbetters' reorganization plan. Dr. Mylander signed an "Unconditional Continuing Guaranty" (guaranty),[6] dated May 4, 1990, which stated that Dr. Mylander "unconditionally guarantees and becomes surety for the full and prompt payment to Murray at maturity, whether by acceleration or

---

[6] Throughout the remainder of this opinion, we will refer to both the guaranty document and the obligation assumed by petitioners within that document (which was subsequently amended on February 1, 1993) as the guaranty.

[*7] otherwise, and at all times thereafter, the principal amount of the note, namely $300,000". The guaranty was later amended to include Mrs. Mylander as a guarantor.

Pursuant to his agreement with petitioners, Mr. Ledbetter transferred his ownership interest in the Nevada store to Mr. Koch. Neither petitioners nor Mr. Koch knew that Mr. Ledbetter "had leveraged * * * [the Nevada store] to the hilt", leaving it with little to no equity. As the new owner, Mr. Koch became obligated to service the debt on the Nevada store, which required him to pay more than $50,000 each month. Mr. Koch soon realized the Nevada store was worthless and found a buyer who agreed to purchase it, and assume the liabilities, for an amount equal to what Mr. Koch had paid servicing the debt up until that point. In other words, Mr. Koch ended up breaking even on the transaction. Because no part of the Koch debt was satisfied by the transfer and sale of the Nevada store, petitioners remained obligated to pay the full $400,000 to Mr. Koch. Petitioners eventually paid off the full $400,000.

The Ledbetters, on the other hand, did not make any payments on their promissory notes to Mr. Murray. Pursuant to the guaranty, on April 26, 1994, Mr. Murray obtained a judgment (State court judgment) against petitioners in the District Court of the Fifth Judicial District of the State of Idaho, in and for the

[*8] County of Blaine for $310,000. In December 2001 Mr. Murray entered into a covenant not to execute with petitioners in which Mr. Murray agreed not to execute on the State court judgment as long as petitioners made regular payments to him (first at $500 per month and later at $1,000 per month) until they had paid off the full $300,000 as set forth in the guaranty. Petitioners began making payments to Mr. Murray pursuant to the covenant not to execute and continued making payments through 2009.

The Ledbetters sent several checks to petitioners, ostensibly to meet their obligations under the indemnity; however, each of those checks was returned to petitioners for insufficient funds. Petitioners received nothing of value from the Ledbetters.

In 2010 petitioners made seven monthly payments of $1,006[7] to Mr. Murray, leaving a $202,000 balance on the Murray debt. In or around that same year Dr. Mylander and his colleagues sold their dental practice in Baker City, Oregon. With extra cash on hand from the sale of the dental practice, petitioners offered to pay Mr. Murray a lump sum of $100,000 if he would agree to forgive

---

[7] The $1,006 consisted of a $1,000 payment on the principal and a $6 escrow fee.

[*9] the remaining $102,000 on the Murray debt (remaining debt). Mr. Murray accepted the offer and forgave the remaining debt by the end of 2010.

IV.    Tax Return Preparation

David W. Hammons, an accountant working for the C.P.A. firm Wilson, Harris & Co., prepared petitioners' 2009 and 2010 Forms 1040, U.S. Individual Income Tax Return. Mr. Hammons is not a C.P.A. For their 2009 and 2010 tax years, petitioners prepared summaries of their income and expenses and provided those summaries to Mr. Hammons before mid-April of 2010 and 2011. Mr. Hammons prepared each year's returns using the figures in the summaries.

The following table shows relevant deductions petitioners claimed on their Forms 1040 for 2009 and 2010 and the amounts respondent allowed and disallowed in the notice of deficiency:

| [*10]    Item | Amount on return | | Adjustment per notice | |
| --- | --- | --- | --- | --- |
| 2009 Schedule E residential rental expenses | Reported: | [1]$10,398 | Allowed: | $7,746 |
| | | | Disallowed: | 2,652 |
| 2009 Schedule C other expenses | Reported: | 12,072 | Allowed: | -0- |
| | | | Disallowed: | [2]12,072 |
| 2009 Schedule C supplies | Reported: | 14,329 | Allowed: | -0- |
| | | | Disallowed: | [3]14,329 |
| 2009 Schedule A unreimbursed business and employee expenses | Reported: | 28,580 | Allowed: | 12,564 |
| | | | Disallowed: | [4]16,016 |
| 2010 Schedule A unreimbursed employee expenses | Reported: | 22,593 | Allowed: | 11,355 |
| | | | Disallowed: | [5]11,238 |

[1] This amount consists of $10,016 petitioners reported on Line 14, Repairs, and $382 erroneously reported on Line 17, Utilities. It is clear from the record that the $382 of expenses reported on Line 17 was not for utilities (which were paid from the McCall account) but for repairs made to the McCall property's electrical system, and should have been included on Line 14.

[2] Respondent allowed this amount as a long-term capital loss.

[3] Respondent allowed this amount as a short-term capital loss.

[4] This amount includes $2,531, which is the amount petitioners reported for travel-related expenses and have since conceded, and $6,535, which is the amount petitioners reported for CDE expenses. Petitioners did not challenge the remaining $6,950 of disallowed Schedule A deductions for 2009 in their petition, at trial, or on brief, and this amount is deemed conceded.

[5] This amount includes $8,447, which is the amount petitioners reported for travel-related expenses and have since conceded. Petitioners did not challenge the disallowance of the remaining $2,791 of Schedule A deductions for 2010 in their petition, at trial, or on brief, and this amount is deemed conceded.

**[*11]**                                    OPINION

I.     Burden of Proof

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). There are exceptions to this rule. Section 7491(a) shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if the taxpayer meets certain preliminary conditions. Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001). This case is decided on the preponderance of the evidence and is not affected by the burden of proof or section 7491(a).

II.    CDE

Section 162(a) allows a deduction for all ordinary and necessary expenses incurred in carrying on a trade or business. Although this section does not explicitly mention expenditures for education, the regulations provide an objective test for determining whether such expenditures are deductible. Diaz v. Commissioner, 70 T.C. 1067, 1072-1073 (1978), aff'd without published opinion, 607 F.2d 995 (2d Cir. 1979); see sec. 1.162-5(a), Income Tax Regs. Respondent

**[*12]** does not contend that the reported CDE expenses at issue are not deductible but argues that petitioners have failed to substantiate them.

When taxpayers establish that they have incurred deductible expenses but are unable to substantiate the exact amounts, we can estimate the deductible amount in some circumstances, but only if the taxpayers present sufficient evidence to establish a rational basis for making the estimate. See Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). In estimating the amount allowable, we bear heavily against taxpayers whose inexactitude is of their own making. See Cohan v. Commissioner, 39 F.2d at 544. There must be sufficient evidence in the record, however, to permit us to conclude that a deductible expense was paid or incurred. Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957). Furthermore, we may not use the Cohan rule to estimate expenses subject to the strict substantiation requirements of section 274(d).[8] See Sanford v. Commissioner, 50 T.C. 823, 827 (1968), aff'd, 412 F.2d 201 (2d Cir. 1969).

In order to substantiate their CDE expenses for 2009, petitioners offered into evidence a handwritten summary of figures (CDE summary) including

---

[8] None of the expenses at issue in this case are subject to strict substantiation under sec. 274(d).

[*13] expenses related to Dr. Mylander's dental practice. The CDE summary listed CDE expenses totaling $6,535. At trial, Dr. Mylander testified that he had prepared the CDE summary at the beginning of 2010 and based the figures contained therein on canceled checks and receipts. He also testified that he could not produce those underlying documents during the audit or at trial because he had placed them in a cardboard box which was subsequently misplaced by a moving company when petitioners moved to a new house in November 2009.

While we generally find Dr. Mylander to be a credible witness, we are troubled by the contradictions in his testimony regarding the preparation of the CDE summary. If the underlying documents were lost in November 2009, Dr. Mylander could not have used those documents to prepare the CDE summary in early 2010. Consequently, we find that the CDE summary is too unreliable to establish a rational basis for making an estimate.

The record establishes, though, that Dr. Mylander was required to earn 40 hours of CDE in order to maintain his professional license, that he fulfilled that requirement in 2009, and that he incurred deductible expenses in doing so. During the audit Dr. Mylander prepared a document, at the request of the revenue agent, explaining the loss of his CDE records and identifying, to the best of his recollection, the CDE courses he attended during 2009. In the document, Dr.

**[\*14]** Mylander also estimated that his "continuing ed studies result [sic] in about $100 per class hour." We find this estimate of costs incurred to be reasonable. Accordingly, because Dr. Mylander needed 40 CDE hours to maintain his dentistry license, we estimate that he had $4,000 of deductible CDE expenses for 2009.[9] Respondent's disallowance of the remaining $2,535 is sustained.

III.    Rental Expenses

Petitioners claimed a deduction of $10,398 for rental expenses attributable to the McCall property on their Schedule E, Supplemental Income and Loss, for 2009. This amount consisted of $3,000 in contributions to the McCall account ($250 × 12) and $7,398 in repairs that petitioners claimed to have paid directly.[10] During the audit petitioners provided respondent with records showing that they had paid directly for repairs totaling $7,364, including $382 for electrical repairs. They were unable to substantiate that they had paid expenses corresponding to the $3,000 reported for contributions to the McCall account or to the remaining $34 ($7,398 – $7,364) reported for repairs. On the basis of these records, respondent

---

[9] Respondent states that, in the notice of deficiency, he allowed an itemized deduction of $2,801 for "licensing and training" expenses for 2009. However, this amount does not include any of petitioners' reported CDE expenses for that year.

[10] Of the $10,398, $10,016 was reported on Line 14 as repair expenses and $382 on Line 17 as utilities expenses. The $382 was for electrical repairs on the McCall property, not for utilities, and should have been included on Line 14.

[*15] allowed a deduction of $7,746 and disallowed the remaining $2,652 on substantiation grounds.[11]

Petitioners claim that, in addition to the $7,746 already allowed by respondent, they are entitled to deduct $2,644 (i.e., half of the $5,288 that Mrs. Lehman paid out of the McCall account in 2009). Petitioners concede the remaining $8 ($10,398 – $7,746 – $2,644).

During 2009 Mrs. Lehman maintained a ledger in which she recorded the rental expenses with respect to the McCall property that were paid out of the McCall account. Respondent now argues on brief that the ledger contained only

---

[11] The $7,746 consists of the $7,364 petitioners substantiated plus an additional $382. It appears from the record that respondent double-counted the $382 petitioners spent on electrical repairs.

[*16] rental expenses incurred during 2009 (i.e., $5,288),[12] but that respondent

"generously allowed petitioners $7,746.00 in rental expenses for 2009."

We find respondent's argument unpersuasive. During the audit, petitioners

provided the revenue agent with sufficient documentation to substantiate the rental

expenses they paid directly in 2009 but were unable to substantiate the expenses

paid from the McCall account. At trial Mrs. Lehman credibly testified that in

2009 she paid expenses totaling $5,288 from the McCall account and that

petitioners' share of those expenses was half, or $2,644.

---

[12] In making this argument, respondent relies on the following exchange between respondent's counsel and Mrs. Lehman during cross-examination:

> Q   Okay. And this expense total is all of the expenses within this ledger?
> A   Yes.
> Q   Were those all of the expenses for the rental that year?
> A   Yes, I believe it is.
> Q   Okay. So you were the only one who maintained the books for the rental?
> A   Yes.

After our review of Mrs. Lehman's ledger and the expense deductions claimed by petitioners, it is clear that the Lehmans and petitioners used funds from the McCall account to pay recurring expenses such as utilities, insurance, and taxes. The expenses paid from petitioners' own accounts, on the other hand, appear to be related to repairs or renovations. Accordingly, we find that nothing in Mrs. Lehman's testimony contradicts petitioners' claims that they had rental expenses in excess of those paid out of the McCall account.

**[*17]**  We find that, out of the $10,398 deduction petitioners claimed, they have substantiated $2,644 of rental expenses paid out of the McCall account and $7,364 of repair expenses that they paid directly.  As to the remaining $390 ($10,398 – $7,364 – $2,644), $382 was not substantiated by petitioners and was likely allowed by respondent in error, and petitioners have conceded the final $8.  Respondent's disallowance of the remaining $390 is sustained.

IV.   COD Income

   A.   Generally

Gross income includes all income from whatever source derived.  Sec. 61(a).  Discharge of indebtedness is specifically included as an item of gross income.  Sec. 61(a)(12).  The difference between the face value of a debt and the amount paid in satisfaction of that debt is in general includable in a taxpayer's gross income.  Babin v. Commissioner, 23 F.3d 1032, 1034 (6th Cir. 1994), aff'g T.C. Memo. 1992-673.

However, not all discharges of indebtedness are includable in gross income.  For example, section 108 excludes certain discharges from gross income.  See sec. 108(a), (e)(2), (f) (excluding discharge of indebtedness from gross income in certain cases involving, inter alia, insolvency, qualified farm indebtedness, lost deductions, and certain student loan discharges).  The courts have also developed

[*18] exceptions. For example, we have previously held that a guarantor does not realize COD income upon the release of a contingent liability. Landreth v. Commissioner, 50 T.C. 803 (1968); Hunt v. Commissioner, T.C. Memo. 1990-248, 59 T.C.M. (CCH) 635 (1990). In Landreth v. Commissioner, 50 T.C. at 813, we wrote:

> The situation of a guarantor is not like that of a debtor who as a result of the original loan obtains a nontaxable increase in assets. The guarantor obtains nothing except perhaps a taxable consideration for his promise. Where a debtor is relieved of his obligation to repay the loan, his net worth is increased over what it would have been if the original transaction had never occurred. This real increase in wealth may be properly taxable. United States v. Kirby Lumber Co., 284 U.S. 1 (1931). However, where the guarantor is relieved of his contingent liability, either because of payment by the debtor to the creditor or because of a release given him by the creditor, no previously untaxed accretion in assets thereby results in an increase in net worth. * * *

B.     Whether Hunt and Landreth Are Distinguishable

1.     Contingent Nature of the Liability

Petitioners argue that they were acting as guarantors and, under Hunt and Landreth, did not realize any COD income. Respondent argues that petitioners must recognize COD income because the guaranty was not contingent and Hunt and Landreth are, therefore, distinguishable because the guaranties in those cases were contingent. In making his argument respondent relies on the following

**[*19]** statement from the guaranty: "The liability of the undersigned Guarantor is absolute and unconditional, and is not conditional or contingent upon any other party signing this continuing Guaranty".

Petitioners contend that respondent is misinterpreting the guaranty. According to petitioners, "[t]he obligation of a guarantor is not contingent because another party may or may not have to sign the guaranty; the obligation of a guarantor is contingent upon the primary obligor defaulting."

We agree with petitioners that the guaranty created a contingent liability because petitioners' obligation to make a payment under the guaranty was contingent upon the primary obligor's (i.e., the Ledbetters') failure to pay the debt.[13] See Perry v. Commissioner, 47 T.C. 159, 163 (1966), aff'd, 392 F.2d 458 (8th Cir. 1968); 38 Am. Jur. 2d, Guaranty, sec. 2 (2010) ("A guaranty creates a secondary obligation under which the guarantor promises to be responsible for the debt of another. The guarantor is only secondarily liable in the event the debtor does not perform the primary obligation."). The guaranty in this case creates the same type of contingent liability as those we discussed in Hunt and Landreth.

---

[13] Respondent's argument that the guaranty was not contingent because it was "absolute and unconditional, and * * * not conditional or contingent upon any other party signing [it]" lacks merit. See 38A C.J.S. Guaranty secs. 9, 60 (2008) (defining an absolute or unconditional guaranty and a continuing guaranty).

[*20]    2.    Consideration for the Guaranty

Respondent argues that this case can be further distinguished from Landreth and Hunt and that petitioners must recognize COD income because they received consideration in exchange for the guaranty. Respondent argues that the Ledbetters' transfer of the Nevada store to Mr. Koch constituted taxable consideration to petitioners and, therefore, "[t]he reasoning in Kirby Lumber applies and resulted in petitioners' receipt of taxable * * * [COD] income". Petitioners argue that the transfer of the Nevada store did not result in their receiving any taxable COD income because (1) the consideration received (i.e., the transfer of the Nevada store from Mr. Ledbetter to Mr. Koch) had no value and (2) under Landreth and Hunt any taxable consideration received by a guarantor in exchange for his guaranty is recognized for the year in which it is received and, consequently, does not affect the existence or treatment of COD income.

We agree with petitioners that they did not receive any valuable consideration in exchange for the guaranty. Petitioners entered into the guaranty with Mr. Murray in exchange for the Ledbetters' promise to satisfy the Koch debt and to indemnify petitioners for any loss petitioners might incur with respect to the guaranty. The Ledbetters, however, did not keep either promise. While they did transfer the Nevada store to Mr. Koch, it was "leveraged to the hilt" and had no

[*21] value. As a result, petitioners' obligation to Mr. Koch was not reduced at all by the transfer of the store, and petitioners were required to, and did, pay the Koch debt in full. Then, when the Ledbetters defaulted and petitioners began making payments on the Murray debt, the Ledbetters sent checks to petitioners that were returned for insufficient funds. The Ledbetters made no good-faith attempts to make good on their indemnity. Therefore, we find that petitioners did not receive any valuable consideration in exchange for the guaranty.

C. Primary Obligation

Respondent argues, in the alternative, that petitioners must recognize COD income because they became primary obligors on the Murray debt when the Ledbetters defaulted.

Under the guaranty petitioners were secondary obligors as to the Murray debt because they were obligated to pay the debt only if the Ledbetters--the primary obligors--defaulted. See Restatement 3d, Suretyship & Guaranty, sec. 1 (1996). When the Ledbetters defaulted, a cause of action against petitioners accrued to Mr. Murray which led to the State court judgment against petitioners and the subsequent covenant not to execute. Under the State court judgment, as well as the covenant not to execute, petitioners' secondary obligation became a primary obligation. See Chevron Chem. Co. v. Mecham, 536 F. Supp. 1036, 1043

**[\*22]** (D. Utah 1982) ("Default on the primary contract by the debtor ripens an unconditional guaranty into an actionable liability of the guarantor separate and apart from that of the principal debtor. The guarantor's obligation becomes absolute and is no longer secondary[.]").

Petitioners argue that even if they had become primary obligors on the Murray debt, they did not realize any COD income when the remaining debt was forgiven because they "did not receive the benefit of the non-taxable proceeds from the loan obligation." We agree with petitioners.

Even though petitioners had become primary obligors under the guaranty, their situation remained similar to those of the taxpayers in Hunt and Landreth. We observed in Landreth v. Commissioner, 50 T.C. at 813, that "where the guarantor is relieved of his contingent liability * * * because of a release given him by the creditor, no previously untaxed accretion in assets thereby results in an increase in net worth." See also Hunt v. Commissioner, T.C. Memo. 1990-248, 59 T.C.M. (CCH) at 649-650 (quoting Landreth v. Commissioner, 50 T.C. at 813).

We do not see any material difference between the situation in Landreth and one in which a guarantor's contingent liability has ripened into a primary liability. Unlike a debtor who borrows funds, a guarantor who assumes a contingent liability does not receive an untaxed accretion of assets which is accompanied by

**[*23]** an offsetting obligation to pay. This remains the case even after the guarantor becomes a primary obligor because of the debtor's default. Regardless of whether the guarantor is a secondary obligor or has become a primary obligor, when the debt is discharged the guarantor's net worth is <u>not</u> "increased over what it would have been if the original transaction had never occurred." <u>Landreth v. Commissioner</u>, 50 T.C. at 813.

Petitioners did not receive any untaxed accretion of assets when they gave the guaranty. Nor did they receive any untaxed accretion of assets with respect to the guaranty when they later became primarily liable on the Murray debt as a result of the State court judgment. Therefore, when the remaining debt was forgiven petitioners did not realize an untaxed increase in wealth any more than had they remained secondary obligors.[14]

D.     Conclusion

Petitioners were initially secondary obligors on the Murray debt, under the terms of the guaranty. They did not receive any valuable consideration in exchange for the guaranty. Upon the Ledbetters' default, and the subsequent State

---

[14] Respondent argues that, pursuant to our decision in <u>Hahn v. Commissioner</u>, T.C. Memo. 2007-75, petitioners received an accession to wealth upon the discharge of the remaining debt. We find that <u>Hahn</u> is distinguishable because in that case the taxpayer was a debtor, not a guarantor, and received untaxed loan proceeds. <u>Id.</u>, slip op. at 2.

[*24] court judgment and covenant not to execute, petitioners became primarily liable on the Murray debt. However, at no point did they receive an untaxed accretion of assets with respect to the guaranty. Accordingly, we find that, when the remaining debt was forgiven by Mr. Murray in 2010, petitioners did not have an accession to wealth and did not realize any COD income.

V. Penalties

Pursuant to section 6662(a) and (b)(1) and (2), a taxpayer may be liable for a penalty of 20% of the portion of an underpayment of tax due to: (1) negligence or disregard of rules or regulations or (2) a substantial understatement of income tax. "Negligence" is defined as any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code; this includes a failure to keep adequate books and records or to substantiate items properly. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" means any careless, reckless, or intentional disregard. Sec. 6662(c). "Understatement" means the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). A "substantial understatement" of income tax is defined as an understatement of tax that exceeds the greater of 10% of the tax required to be shown on the tax return or $5,000. Sec. 6662(d)(1)(A).

**[*25]** The Commissioner bears the initial burden of production. Sec. 7491(c). If the Commissioner satisfies his burden, the taxpayer then bears the ultimate burden of persuasion. Higbee v. Commissioner, 116 T.C. at 446-447.

We have previously found that petitioners were able to substantiate only a portion of their rental expenses and CDE expenses for 2009. Petitioners failed to keep adequate books and records to substantiate the remainder of those expenses. See sec. 1.6662-3(b)(1), Income Tax Regs. Therefore, for 2009 respondent has met his burden of production with respect to the negligence penalty relating to the portion of the underpayment that is due to disallowance of deductions for those expenses.[15]

To the extent petitioners' underpayment is due to an understatement of income tax that exceeds the greater of 10% of the tax required to be shown on the tax return or $5,000 for 2009 or 2010, respondent has also met his burden of production as to the substantial understatement penalty.[16]

The accuracy-related penalty is not imposed with respect to any portion of an underpayment as to which the taxpayer shows that he or she acted with

[15] Respondent has not met his burden of production with respect to the negligence penalty for 2010.

[16] We leave this to the parties to determine under Rule 155.

[*26] reasonable cause and in good faith. Sec. 6664(c)(1); Higbee v. Commissioner, 116 T.C. at 448. Petitioners claim that their records substantiating the CDE expenses were inadvertently lost by a moving company during their move in 2009 and argue that this loss was outside of petitioners' control. However, petitioners also claim that they gave their tax preparer a summary which he used to prepare their Form 1040 for 2009 and that they prepared this summary in early 2010 on the basis of the lost records. Petitioners' testimony as to this point is contradictory and not credible. Accordingly, petitioners have not shown that they acted with reasonable cause and in good faith as to the CDE expenses.

Petitioners also argue that they "relied in good faith upon their tax return preparer to make legal determinations as to what amounts constituted income and deductions for income tax purposes." For a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662 accuracy-related penalty determined by the Commissioner, the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's

**[*27]** judgment. <u>Neonatology Assocs., P.A. v. Commissioner</u>, 115 T.C. 43, 99 (2000), <u>aff'd</u>, 299 F.3d 221 (3d Cir. 2002).

Petitioners presented only limited testimony regarding their tax return preparer, Mr. Hammons, and how he prepared their 2009 and 2010 tax returns. The record shows that Mr. Hammons is an accountant and that petitioners provided him each year with bare summaries of their income and expenses. Petitioners did not call Mr. Hammons or any other member of Wilson, Harris & Co. to testify. Petitioners have not shown, by a preponderance of the evidence, that they have satisfied the three-prong test under <u>Neonatology Assocs.</u> Accordingly, they do not meet the reasonable cause and good faith exception.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.
